## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MARIA H.,[1]
    *Plaintiff*,

    v.

COMMISSIONER OF SOCIAL
SECURITY,[2]
    *Defendant.*

No. 3:23-cv-00235 (VAB)

## RULING AND ORDER ON MOTION TO REVERSE THE DECISION OF THE COMMISSIONER AND MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

Maria H. ("Plaintiff" or "Claimant") has filed this administrative appeal under 42 U.S.C.

§ 405(g) against Kilolo Kijakazi, the Acting Commissioner of Social Security ("Defendant" or

"the Commissioner"), seeking to reverse the decision of the Social Security Administration

denying her claims for Title II Disability Insurance Benefits ("DIB") and for Title XVI

Supplemental Security Income ("SSI"), or, in the alternative, to remand the case for a new

hearing. Mot. to Reverse Decision of the Comm'r, ECF No. 16 (May 22, 2023).

The Commissioner has moved to affirm the decision. Def.'s Mot. for an Order Affirming

the Decision of the Comm'r, ECF No. 21 (Jul. 19, 2023).

For the reasons explained below, Maria H.'s motion is **GRANTED** and the

---

[1] In opinions issued in cases filed under § 405(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial in order to protect the privacy interests of social security litigants while maintaining public access to judicial records. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Under Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the Defendant in this suit. No further action need be taken. 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

Commissioner's motion is **DENIED**.

The decision of the Commissioner is **VACATED** and **REMANDED** for rehearing and further proceedings in accordance with this Ruling and Order.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

The Court assumes familiarity with the background of this case. *See* Social Security Tr. at 1298, ECF No. 12 and 12-1 (Apr. 14, 2023) ("Tr.")[3] (Recommended Ruling on Pl.'s Mot. to Reverse the Decision of the Comm'r and on Def.'s Mot. to Affirm the Decision of the Comm'r, *Hernandez v. Saul*, Civil No. 3:20-cv-1788 (SRU) (RAR), ECF No. 19 (Sept. 14, 2021) ("Recommended Ruling")).

#### 1. Prior Underlying Procedural History

On August 17, 2018, Maria H. applied for DIB and SSI and alleged an onset date of disability as of October 20, 2016. Tr. at 1298. Both claims were denied on October 2, 2018 and again on January 23, 2019 upon reconsideration. Tr. at 1299.

On December 12, 2019, Administrative Law Judge ("ALJ") Eskunder Boyd held a hearing to review the denial of her claims. *Id.*

On January 7, 2020, ALJ Boyd affirmed the denial of Maria H.'s claims. Tr. at 15–30.

On December 1, 2020, Maria H. filed a civil action in this Court seeking review of her denial of benefits. *Hernandez v. Saul*, Civil No. 3:20-cv-1788 (SRU) (RAR), ECF No. 1.

On September 14, 2021, U.S. Magistrate Judge Robert A. Richardson issued a Recommended Ruling recommending that the Commissioner's decision be reversed and remanded because "the administrative record was not adequately developed with respect to

---

[3] Where the internal pagination of the transcript conflicts with the ECF-generated pagination, this Opinion refers to the internal pagination.

medical records." Recommended Ruling at 17; Tr. at 1314. In particular, the Recommended Ruling noted that "[t]he inclusion of mental and physical treatment records from 2019 could have probative value and alter the ALJ's assessment of plaintiff's representations and her overall RFC." Recommended Ruling at 27; Tr. at 1324. The Recommended Ruling further stated that "[o]n remand, the ALJ should request updated treatment notes from plaintiff's treating sources and seek a medical opinion, ideally from a treating source, regarding plaintiff's functional limitations." Recommended Ruling at 36; Tr. at 1333.

On November 5, 2021, U.S. District Judge Stefan R. Underhill adopted the Recommended Ruling and entered judgment accordingly. *Hernandez v. Saul*, Civil No. 3:20-cv-01788 (SRU) (RAR), ECF. No. 23.

On June 15, 2022, the Appeals Council affirmed the decision and remanded Maria H.'s case to an ALJ. Tr. at 1340–45.

### 2. Medical History

Maria H.'s medical history has been extensively detailed in Judge Richardson's Recommended Ruling. *See* Tr. At 1298–1336. The Court will thus only refer to this information as necessary, and focuses its summary to Maria H's medical records from 2019 onwards. [4]

Born on December 23, 1966, Maria H. was 49 years old at the time of her alleged onset date of disability of October 20, 2016. Recommended Ruling at 2; Tr. at 1299. She was 51 at the time that she submitted her application for SSI benefits on August 17, 2018. *Id.* In her application, Maria H. claimed that fibromyalgia, chronic back pain, disc problems, anxiety, and depression limited her ability to work. *Id.*

---

[4] The summary below focuses on the aspects of Maria H.'s medical history that are most pertinent to the Court's analysis, and is not intended to be a complete recitation of Maria H.'s lengthy treatment record and conditions described therein.

Maria H. completed twelfth grade and previously worked as a machine operator and in a "maintenance/packing" role. *Id.*

Maria H. suffers from chronic back pain, disc problems, fibromyalgia, anxiety, and depression. *Id.*

On October 7, 2016, while lifting a box at work, Maria H. suffered a lower back injury, and sought treatment a Yale New Haven Hospital's emergency room where she was diagnosed with "acute right-sided low back pain with sciatica." *Id.* Since then, various medical providers have diagnosed Maria H. with mild degenerative disc disease at L3-L4 and L4-L5 and lumbar radiculopathy. Recommended Ruling at 3–4; Tr. at 1300–01.

From January 17, 2019 to February 8, 2019, Maria H. attended physical therapy sessions at Yale New Haven Health. Tr. 2266-2278. During these sessions, Maria H. complained of "numbness and pain in her hands…[r]ight greater than left" and "pain. . . in her right shoulder." Tr. at 2284. She also claimed her "symptoms [were] worse with use and lifting heavy." Tr. at 2280. In a section marked "Pain Assessment," the provider noted that on a scale from zero ("Extreme difficulty completing activity/task") to 10 ("Can easily perform activity/task"), Maria H. had rated "Lift heavy 10lb" as "0." Tr. at 2267, 2280. Maria H. later discontinued physical therapy because she could not "continue due to pain," and was referred for a surgical consultation. Tr. at 2608.

On April 23, 2019, Maria H. visited orthopedic surgeon, Dr. Richard S. Blum, who noted that "[patient] has pain severe over the right [bicipital] groove" and administered injections of lidocaine and Depo-Medrol. Tr. at 2575, 2577. On October 22, 2019, Dr. Blum again administered injections of lidocaine and Depo-Medrol. Tr. at 2171–72 . Later, on January 23, 2020, Dr. Blum indicated that Maria H. "will get [an] mri and consider consult for surg.

tenedesis etc." Tr. at 2091. On March 5, 2020, Dr. Blum noted that Maria H. had a "[history] of pain right shoulder with need for tenodesis biceps tendon." Tr. at 2062.

On November 1, 2021, Maria H. visited with neurosurgeon Dr. Luis Enrique Kolb at Yale New Haven Hospital. Tr. at 1695. Dr. Kolb noted that Maria H.'s "MRI shows some mild lumbar spondylosis," and "some increased signal in the L4-5 disc space which may represent an annular tear." Tr. at 1698. Dr. Kolb concluded that he "would not recommend any surgical interventions at this point." *Id.*

Maria H.'s fibromyalgia is also well-documented throughout her medical records. As a result, she experiences generalized body pain. Recommended Ruling at 5; Tr. at 1302. Maria H. has reported that her chronic pain causes difficulty sleeping and complains of suffering fatigue. *See, e.g.*, Tr. at 2219 ("reports feeling [t]ired and fatigue that last for days); Tr. 2005 ("Pt endorses chronic pain which interferes with her sleep").

Maria H. has received treatment for her chronic pain from Dr. Jessica Abellard at Cornell Scott Hill Health Center and a pain management clinic, Livwell, and she has reported that treatment has somewhat improved her symptoms. *See, e.g.,* Tr. at 2047 ("While she continues to report pain which interferes with her sleep, it is somewhat improved with Cymbalta"); Tr. at 2050 ("Anxiety and insomnia have improved with increase in Cymbalta dose."); Tr. at 1971 ("complains of ongoing pain that interferes with her sleep but it has improved with tramadol"); Tr. at 1741 ("Reports she is doing better with pain because she is participating in pain management clinic").

Maria H. has also been diagnosed with Generalized Anxiety Disorder. Tr. 1609. From January 2019 to at least July 21, 2022, Maria H. has met regularly with her therapist Francisco

Rosario-Ortiz, Ph.D., from Cornell Scott Hill Health Center on a weekly to biweekly basis.[5] Dr. Rosario-Ortiz has consistently noted that Maria H. experiences "ongoing anxiety due to psychosocial stressors and physical pain" Tr. at 1752; *see also* Tr. at 1636 ("she continues experiencing ongoing physical pain that impacts her mood and anxiety"); Tr. at 1650–51 (Maria H. experiences "worrying and anxiety due to ongoing physical pain, medical complications, and family problem[s]"). Dr. Rosario-Ortiz also reported fluctuation in the severity of Maria H.'s anxiety symptoms. *See, e.g.*, Tr. at 2258 (On August 7, 2019, "Client reports she has had days with increased anxiety and other days that she feels better."); Tr. at 2018 (On April 30, 2020, "Reports 'you know, some bad days and other betters, hanging on'.); Tr. at 1942 (On July 20, 2020 "Client reports she has 'good and bad days'"); Tr. at 1924 (On September 24, 2020, [Maria H] "[r]eports that last week her pain intensified and her anxiety as well. Reports noticing that when she gets very anxious she tends to avoid and isolate herself.")

Maria H. also underwent gynecological/abdominal surgery on October 31, 2019, Tr. at 2146, 2162–64, and cataract surgery on January 13, 2020 (right eye) and January 27, 2020 (left eye), Tr. at 2084–90, 2075–76.

### 3. Medical Opinions

The ALJ did not seek additional medical opinions, and considered Dr. Rosario-Ortiz's and Dr. Jimena Tuis-Elizalde's joint impairment questionnaire previously submitted on

---

[5] Maria H. has had over 100 sessions with Dr. Rosario-Ortiz from January 2019 to July 2022. *See*, Tr. at 2700–02; 2694–96; 2691–93; 2688–90; 2685–87; 2682–84; 2679–81; 2673–75; 2670–72; 2667–69; 2664–66; 2660–62; 2657–59; 2654–56; 2651–53; 2648–50; 2645–47; 2642–44; 2639–41; 2253–56; 2233–36; 2225–28; 2206–09; 2193–96; 2173–76; 2164–67; 2140–42; 2126–29; 2119–21; 2081–84; 2078–80; 2068–71; 2064–67; 2059–61; 2051–53; 2043–46; 2040–43; 2034–37; 2027–29; 2016–19; 2013–16; 2010–12; 2007–10; 2004–06; 1997–2000; 1993–96; 1979–82; 1976–79; 1967–70; 1963–67; 1953–56; 1944–47; 1940–42; 1937–39; 1919–22; 1916–19; 1906–09; 1903–06; 1898–1903; 1895–98; 1887–91; 1873–76; 1861–64; 1855–57; 1846–49; 1843–46; 1831–33; 1828–30; 1819–21; 1816–18; 1804–07; 1801–04; 1785–88; 1781–84; 1767–70; 1764–67; 1761–64; 1747–50; 1742–44; 1736–39; 1724–26; 1720–22; 1710–17; 1703–05; 1691–93; 1688–90; 1685–87; 1677–80; 1670–74; 1665–66; 1661–64; 1659–61; 1652–54; 1648–51; 1642–48; 1631–34; 1628–31; 1623–26; 1620–23; 1616–18; 1612–15.

December 3, 2018 and the State Agency assessments from fall 2018 and January 2019. [6] Tr. at

1261–62.

In his Recommended Ruling, Judge Richardson provided the following summary of this

medical opinion evidence:

> State agency examiners completed initial evaluations in September and October
> of 2018 and found plaintiff not disabled. (See R. 79–93.) Dr. Michael Bohnert conducted
> a psychiatric review of plaintiff's medical records and found her anxiety to be non-
> severe. (R. 79.) Dr. Bonhert opined that plaintiff's anxiety did not meet Listing 12.06
> (anxiety and obsessive-compulsive disorders). Under the "B" criteria of the Listings,
> plaintiff had mild limitations in her ability to interact with others, concentrate or maintain
> pace, and manage herself. (R. 79.) The evidence did not establish any presence of "C"
> criteria. (R. 79.) Plaintiff could perform her past relevant work in maintenance/packing,
> as actually performed. (R. 83.) More specifically, plaintiff could: occasionally lift or
> carry 20 pounds; frequently lif[t] or carry 10 pounds; sit, stand, or walk for a total of 6
> hours in an 8-hour workday; occasionally climb stairs, climb ladders, stoop, kneel,
> crouch, and crawl; and frequently balance. (R. 81.)
>     State agency examiners completed evaluations on reconsideration in January of
> 2019. The examiners reviewed plaintiff's medical records and determined that plaintiff's
> fibromyalgia, sleep-related breathing disorders, and degenerative disc disease were
> severe impairments, while her anxiety was a non-severe impairment. (R. 101.) Deborah
> Stack, Ph.D., opined that plaintiff's anxiety did not meet Listing 12.06 and produced mild
> limitations under the "B" criteria. (R. 102.) Plaintiff's impairments were considered
> under Listings 12.06 (anxiety), 1.02 (major joint dysfunction), and 1.04 (spine disorders).
> (R. 102.) Dr. Marcia Foster opined that plaintiff would be able to adjust to other light
> work. (R. 106–07.) Plaintiff could: occasionally lift or carry 20 pounds; frequently lift or
> carry 10 pounds; stand, walk, or sit for 6 hours in an 8-hour workday; occasionally climb
> ramps, climb ladders, stoop, kneel, crouch, crawl; and frequently balance. (R. 103–04.)
>     Dr. Rosario-Ortiz completed a medical source statement in November of 2018
> which was co-signed by Dr. Tuis Elizalde. (R. 1210–14.) Dr. Rosario-Ortiz diagnosed
> plaintiff with Generalized Anxiety Disorder and found plaintiff to have good judgment
> and fair insight. (R. 1210–11.) Plaintiff's functional ability was "sometimes a problem"
> for "using appropriate coping skills," "handling frustration appropriately," and "asking
> questions or requesting assistance." (R. 1212.) However, plaintiff had average functional
> ability when taking care of personal hygiene, caring for herself, using good judgment,
> interacting appropriately with others, responding appropriately to others in authority, and
> getting along well with others without distracting them. (R. 1212–13.) With respect to
> performing tasks, plaintiff had average functioning ability for carrying out single- and
> multi-step instructions, changing tasks, and performing basic activities at a reasonable
> pace. (R. 1213.) Plaintiff's abilities were "sometimes a problem" for focusing long

---

[6] Dr. Michael Bohnert completed his psychiatric evaluation on September 28, 2018, and Dr. Phyllis Sandell
completed her physical evaluation on October 2, 2018. Tr. at 79, 81. Dr. Deborah Stack completed her evaluation on
January 7, 2019 and Dr. Marcia Foster completed her evaluation on January 13, 2019. Tr. at 101, 104.

enough to finish tasks and persisting in simple activities without being interrupted by psychological symptoms. (R. 1213.)

Recommended Ruling at 7–9; Tr. at 1304–06.

### 4. <u>Administrative Hearing</u>

On November 28, 2022, the ALJ held an administrative hearing in which Maria H., through an interpreter, gave testimony, as well as a vocational expert, Dawn Blythe. Tr. at 1271–92.

Maria H. stated that she experienced chronic pain, and "there are days when [her] medications help [her], but there are other days where these medications do not help [her]." Tr. at 1285. She also testified that she has trouble falling asleep, and was told she needs to use a machine due to her sleep apnea. Tr. at 1286. She also stated that lifting weights at home as well as her cataract surgery and anxiety aggravated her pain symptoms. Tr. at 1285.

Maria H. also testified that she could not lift more than ten pounds for many years, although, in response to the ALJ's hypothetical asking if she could "take a gallon of milk from the back of the store, and carry it all the way to the checkout lane," she responded that she could, "[h]owever, it's painful for [her]." Tr. at 1287.

Maria H. also testified that, without carrying anything, she could walk to the bus stop across the street from her apartment, take the bus, and go to her appointment a short distance from the bus stop. Tr. at 1287–88.

Maria H. stated that she can stand for a period of 15 to 30 minutes before needing to rest, and can bend and touch her knees. Tr. at 1288.

She also claimed that she can lift her left arm over her head, however she cannot lift her right arm. Tr. at 1288–89.

Maria H. stated that exposure to cold weather aggravated her pain symptoms. Tr. at 1289.

She also claimed that the medication she was taking was "very strong" and impacted her ability to concentrate. Tr. at 1289–90; see also Tr. at 1290 (Q: How long are you able to watch something, like a TV show or a movie, before you lose focus? A: It takes a while. For example, my daughter is coming for a visit. And I cannot concentrate when we are talking because I'm constantly repeating things like, hey, I have here, I have there. And I cannot focus, due to the pains.")

Maria H. further testified that her pain causes her anxiety, and she is unable to leave her home. Tr. at 1291.

Vocational expert Dawn Blythe then stated that an individual with Maria H.'s conditions[7] could perform the job of routing clerk, marker, and router. Tr. at 1293.

Ms. Blythe further testified that the same individual who was merely sedentary could perform the jobs of ticket counter, document preparer, and nut sorter. Tr. at 1294.

If the individual was unable to sustain concentration, pace, and persistence for two-hour segments, however, Ms. Blythe stated that such individual "would not be able to sustain any employment." *Id.*

In response to her counsel's question regarding the number of jobs available to an individual who could not speak the English language, Ms. Blythe testified that only the nut sorter job would be available. Tr. at 1295.

---

[7] The ALJ presented the hypothetical of an individual of Maria H.'s age, education, and vocational background who "may never climb ladders, ropes, or scaffolds. Occasionally climb stairs and ramps. Occasionally balance, stoop, and crouch, but may never kneel or crawl. No overhead reaching with the right arm, which is the dominant. And no work in exposure to cold. . . . [Who] could perform simple, routine, repetitive tasks, and sustain concentration, pace, and persistence for two-hour segments. Occasional interaction with supervisors, occasional non-collaborative interaction with co-workers, and brief and superficial interaction with the public, with brief and superficial amounting to no more than 10% of the workday. . . . [Who] requires work with little to no changes in duties or routines, and no work requiring independent judgment making. . . . No responsibility for the safety of others." Tr. at 1293.

Ms. Blythe further testified that if the person could only make occasional use of their right arm, there would not be any jobs available. *Id.*

     5. <u>ALJ Decision</u>

On December 20, 2022, after careful consideration of the entire record, the ALJ issued a partially favorable decision finding that Maria H. was disabled as of December 22, 2021. The ALJ determined that Maria H. remained insured through December 31, 2021. *Id.* at 1257.

At Step One, the ALJ found that Maria H. did not engage in substantial gainful activity during the period from her alleged onset date of October 20, 2016. *Id.*

At Step Two, the ALJ found that since her alleged onset date of October 20, 2016, Maria H. had the following severe impairments: Cervical Radiculopathy, Lumbar Radiculopathy, and Fibromyalgia. *Id.* The ALJ considered Maria H.'s mental health treatment records but found that she did not have a severe mental health impairment. *Id.* at 1258.

At Step Three, the ALJ determined that since her alleged onset date of October 20, 2016, Maria H. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR, Part 404, Subpart P, Appendix 1. *Id.* at 1259. The ALJ stated that, Maria H.'s cervical radiculopathy and lumbar radiculopathy were not sufficiently severe because "there are no findings on imaging consistent with compromise of a nerve root(s) in the cervical or lumbosacral spine," and her fibromyalgia was not sufficiently severe because "there is no evidence of persistent deformity resulting in inability to ambulate effectively or perform fine and gross movements," and "no evidence of persistent inflammation or deformity of peripheral joints." *Id.* at 1259.

He further found that Maria H. had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except that she was unable to climb ladders,

ropes, or scaffolds, to kneel or crawl, or to perform overhead reaching with her dominant (right) arm. In addition, she was limited to occasional climbing of stairs and ramps, and occasional balancing, stooping, and crouching. Further, she had to avoid work in exposure to cold. *Id.*

At Step Four, the ALJ found that Maria H. was unable to perform any past relevant work. *Id.* at 1262.

At Step Five, the ALJ determined that, considering Maria H.'s age, education, work experience, and residual functional capacity, before her age category changed on December 22, 2021, there were jobs that existed in significant numbers in the national economy that she could have performed, such as a marker, routing clerk, or router. *Id.* at 1263. Beginning on when her age category changed on December 22, 2021, however, there were no jobs that exist in significant numbers in the national economy that she could perform. *Id.* at 1264.

Accordingly, the ALJ determined that Maria H. was not disabled before her age category changed on December 22, 2021, but she became disabled on that date and continued to be disabled through the date of the decision, December 20, 2022.

Maria H. did not file any written exceptions to the ALJ's decision, and the Appeals Council did not undertake its own motion review, so the ALJ's decision became the final, appealable decision of the Commissioner sixty-one days after it issued. Tr. at 1248.

### B.  Procedural History

On May 22, 2023, Maria H. filed a motion seeking the reversal of the decision of the Commissioner. Mot. to Reverse Decision of the Comm'r, ECF No. 16; Mem. in Supp. of Mot. to Reverse, ECF No. 16-1 (Mem.).

On July 19, 2023, the Commissioner filed a motion to affirm the decision of the
Commissioner. Mot. to Affirm the Decision of the Comm'r, ECF No. 21; Mem. in Supp. of Mot.
to Affirm the Decision of the Comm'r, ECF No. 21-1 ("Opp.").

## II.    STANDARD OF REVIEW

"A district court reviewing a final . . . decision [of the Commissioner of Social Security]
pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an
appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "In reviewing a
final decision of the SSA, this Court is limited to determining whether the SSA's conclusions
were supported by substantial evidence in the record and were based on the correct legal
standard." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. §
405(g)).

Substantial evidence is "more than a mere scintilla." *Brault v. Comm'r of Soc. Sec.*, 683
F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). It is
generally "such relevant evidence as a reasonable mind might accept as adequate to support a
conclusion." *Brown v. Apfel*, 174 F.3d 59, 61 (2d Cir. 1999) (internal quotation marks omitted)
(citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). To determine "whether the agency's
findings are supported by substantial evidence, 'the reviewing court is required to examine the
entire record, including contradictory evidence and evidence from which conflicting inferences
can be drawn.'" *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *Mongeur v.
Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

When "the Commissioner's decision applies the correct legal principles and is supported
by substantial evidence, that decision will be sustained." *Kumar v. Berryhill*, No. 3:16-cv-1196

(VLB), 2017 WL 4273093, at *4 (D. Conn. Sept. 26, 2017) (citing *Schauer v. Schweiker*, 675

F.2d 55, 57 (2d Cir. 1982)). On the other hand, "[a]n ALJ's failure to apply the correct legal

standard constitutes reversible error if that failure might have affected the disposition of the

case." *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 341 (S.D.N.Y. 2020) (citing *Kohler v. Astrue*,

546 F.3d 260, 265 (2d Cir. 2008)). A court generally need not remand a case if the ALJ only

committed harmless error, such that "application of the correct legal principles to the record

could lead only to the same conclusion." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010)

(alteration omitted) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).


## III.    DISCUSSION

In order to be entitled to benefits under the Social Security Act, a plaintiff must

demonstrate that they have a disability, defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). This determination is made

through a five-step evaluation.

First, the ALJ must determine whether the claimant is engaged in substantial gainful

activity. *Id.* § 404.1520(b).

If they are not engaged in such activity, the ALJ must proceed to Step Two to determine

whether the claimant has a severe medically determinable impairment or combination of

impairments. *Id.* § 404.1520(c). An impairment will be considered severe if it significantly limits

a claimant's ability to perform "basic work activities." *Id.*

If the claimant has a medically determinable severe impairment, then the ALJ proceeds to

Step Three to determine whether any identified severe impairments meet or medically equal those identified in Appendix 1. *Id.* § 404.1520(d). These impairments are *per se* disabling, assuming a claimant meets the duration requirement. *Id.*

If the claimant's impairments are not *per se* disabling, then the ALJ proceeds to Step Four, which entails assessing the claimant's residual functional capacity, or their ability to work in light of their limitations. *Id.* §§ 404.1520(a)(4)(iv), 404.1520(e), 404.1545(a)(1).

At Step Five, the ALJ must establish whether the claimant's residual functional capacity will allow the performance of any past relevant work. If the claimant is unable to perform past relevant work, the ALJ bears the burden of proving that, accounting for the claimant's age, education, work experience, and residual functional capacity, the claimant can perform other work that exists in significant numbers in the national economy. *Id.* § 404.1520(g)(1). If the ALJ proves all of that, then the claimant is not disabled. *Id.*

The claimant bears the burden of proving the requirements of Steps One through Four, after which the burden shifts to the Agency to prove that the claimant is capable of working. *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983) ("The burden is on the claimant to prove that he is disabled within the meaning of the Act . . . . However, if the claimant shows that his impairment renders him unable to perform his past work, the burden then shifts to the Secretary to show there is other gainful work in the national economy which the claimant could perform.").

Maria H. argues that the Commissioner's decision should be reversed for four reasons. First, she argues that the ALJ made a reversible error through failing to develop the administrative record.  Mem. at 14. Second, Maria H. argues that the ALJ failed to meaningfully consider her fibromyalgia and chronic pain. Third, she contends that the ALJ failed to adequately

assess her vision issues and to consider her mental impairments. Fourth, Maria H. argues that the ALJ's Step Five analysis was flawed.

The Court addresses each argument in turn.

### A. The Adequacy of the Administrative Record

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). "[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel.'" *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (quoting *Perez*, 77 F.3d at 47). On the other hand, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa*, 168 F.3d at 79 (internal quotation and citation omitted).

"The ALJ must seek additional evidence or clarifications from medical sources when documentation in the record is insufficient to determine whether the claimant is disabled." *Acosta Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-0502 (AJN) (KHP), 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted sub nom. Cuevas v. Comm'r of Soc. Sec.*, No. 20CV0502KMWKHP, 2022 WL 717612 (S.D.N.Y. Mar. 10, 2022) (citing *Sanchez v. Comm'r of Soc. Sec.*, No. 18-cv-2027 (KMK), 2019 WL 4673740 at *8 (S.D.N.Y. Sept. 25, 2019)). "This duty is particularly important where a claimant alleges disability due to mental illness." *Acosta*, 2021 WL 363682, at *10.

"Whether the ALJ has satisfied this duty to develop the record is a threshold question"

that the Court must consider "[b]efore determining whether the Commissioner's final decision is supported by substantial evidence." *Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 577 (S.D.N.Y. 2022); *see also Moran v. Astrue*, 569 F.3d 108, 114–15 (2d Cir. 2009) ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

Maria H. argues that the ALJ failed to develop the administrative record because he did not obtain medical records from her treating physicians at Livwell, where she received pain management treatment. Maria H. further argues that the ALJ should have sought updated medical source records from Dr. Rosario-Ortiz and medical source statements from Maria H.'s other medical providers, such as "orthopedist Dr. Richard Blum, gastroenterologist, Rogelio G. Perez, ophthalmologist Dr. Vincente A. Diaz, primary care providers Dr. Ines Aranguren and PA Kaitlyn Cordeiro, and medication management physicians Drs. Aline Cenoz-Donati and Jessica Abellard." Mem. at 15.

In response, the Commissioner argues that Maria H. does not explain what information she believes records from Livwell would add to the record, and that the ALJ had sufficient evidence for his decision. Opp. at 14–15. The Commissioner further states that "under the new regulations, treating source opinions no longer have the same significance that they once had," and thus the ALJ was not required to obtain more opinions from Maria H.'s treating sources. Opp. at 8–9.

The Court disagrees, at least in part.

    1. <u>The Medical Records from Livwell</u>

As Judge Richardson noted in his Recommended Ruling, "[m]erely identifying missing records does not satisfy plaintiff's burden to demonstrate that the ALJ's error to procure medical

records was not harmless." Recommended Ruling at 20; Tr. at 1317. Maria H. has not attempted

to offer, or even explain, how medical records from Livwell would undermine the ALJ's

decision. While Maria H.'s medical records refer to her treatment at a pain management clinic,[8]

an "ALJ's duty to develop the record is not 'infinite.'" *Tatelman v. Colvin*, 296 F. Supp. 3d 608,

612 (W.D.N.Y. 2017) (internal citation omitted). Without some showing that these records

would provide additional information not captured in Maria H.'s other medical records from

various medical providers documenting her chronic pain, *see e.g.,* Tr. 1634–45, 1695–1700,

1706, 1735, 1740, 1780, 1927, Maria H. has failed to demonstrate that her medical records were

incomplete because they did not include records from her pain management clinic. *Yucekus v.*

*Comm'r of Soc. Sec.*, 829 F. App'x 553, 558 (2d Cir. 2020) ("Although Yucekus claims there are

additional records that should have been considered, he has not proffered such evidence and has

not explained why he could not have obtained and presented such evidence to the ALJ.").

2. Additional Medical Source Statements

As for the ALJ's failure to obtain medical source statements from Maria H.'s treating

providers, however, the Court agrees that this constitutes a failure to develop the record.

The regulations regarding the evaluation of various medical opinions were amended for

claims filed after March 27, 2017, and the "Treating Physician Rule"[9] no longer applies. *See*

---

[8] While the Commissioner claims that "Livwell appears to be mentioned a single time in the administrative 3,507-page record," Opp. at 14, the Court notes several references to Maria H.'s pain management clinic throughout the record. *See, e.g.,* Tr. at 1656 ("[Patient] states she needs the MRI from oct 2 to be faxed to Pain management 764 Campbell Ave"); Tr. at 1699 ("She continues with Pain Management in West Haven"); Tr. at 1700 ("She sees a pain management specialist in West Haven"); Tr. at 1741 ("Reports she is doing better with pain because she is participating in pain management clinic").

[9] The "Treating Physician Rule" gives "deference to the views of the physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). Under this rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).

Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5867–68 (Jan. 18, 2017); *see also* 20 C.F.R. §§ 404.1520c, 416.920c. Maria H.'s application, which was filed on August 17, 2018, is subject to the new regulations.

"Under the new [SSA] regulations, "[a] survey of . . . cases . . . show[s] that while the treating physician's rule was modified, the essence of the rule remains the same, and the factors to be considered in weighing the various medical opinions in a given claimant's medical history are substantially similar." *Ting v. Comm'r of Soc. Sec.*, No. 23-CV-1241 (PKC), 2024 WL 815841, at *7 n.12 (E.D.N.Y. Feb. 27, 2024) (quoting *Acosta Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-502 (AJN) (KHP), 2021 WL 363682, at *9 (S.D.N.Y. Jan. 29, 2021) (citations omitted), *report and recommendation adopted*, 2022 WL 717612 (S.D.N.Y. Mar. 10, 2022)).

Moreover, "despite the new regulations, an ALJ's duty to develop the record takes on heightened importance with respect to a claimant's treating medical sources, because those sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of a claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." *Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 583 (S.D.N.Y. 2022) (internal citations and quotations omitted).

When formulating a residual functional capacity ("RFC"), an ALJ fails to develop the record if the ALJ does not "request a functional assessment when no such assessment exists in the record or when any such assessments are insufficient." *Jackson*, 588 F. Supp. 3d at 583. While not binding precedent, the Second Circuit found that "remand is not always required when an ALJ fails in his duty to request opinions, particularly where, . . . , the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity."

*Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order). In *Tankisi*, the Court found the "sufficient evidence" standard to be met where the medical records were "extensive," "voluminous," and included "an assessment of [the claimant's] limitations from a treating physician." *Tankisi*, 521 F. App'x. at 34. "Although the treating physician rule has been abolished, the principle espoused by *Tankisi* still applies: whether remand is required because of failure to obtain an opinion from the claimant's treating physician depends on whether the ALJ could have reached an informed decision based on substantial evidence without it." *Russ v. Comm'r of Soc. Sec.*, 582 F. Supp. 3d 151, 163 (S.D.N.Y. 2022).

In his Recommended Ruling, Judge Richardson specifically directed the ALJ to "seek a medical opinion, ideally from a treating source, regarding plaintiff's functional limitations." Recommended Ruling at 36; Tr. at 1333. Although both parties agree that the record contains treatment notes from Maria H.'s medical providers regarding her back pain, fibromyalgia, and mental health, the administrative record does not contain an assessment from Maria H.'s treating physicians discussing the functional limitations caused by her physical conditions, nor does the record contain evidence that the ALJ requested such opinions.

Moreover, while the ALJ obtained treatment records from 2019 until the time his opinion was issued in December 2022, the medical opinions that the ALJ relied upon were from 2018 and January 2019. Thus, these opinions did not account for these extensive records. Courts in this Circuit have found remand to be warranted where medical opinions have become stale because they are no longer consistent with the claimant's medical records. *Russ*, 582 F. Supp. 3d at 164 (remand warranted where the only medical opinion predated the ALJ's decision by more than a year, and "[t]he ALJ thus had no opinion from any medical source, treating or otherwise, as to the significance of the additional records or their implication for Ms. Russ's functional

19

abilities," and the additional records were inconsistent with that medical opinion); *cf. Lesanti v. Comm'r of Soc. Sec.*, 436 F. Supp. 3d 639, 646 (W.D.N.Y. 2020), ("a medical opinion is not necessarily stale simply based on its age. A more dated opinion may constitute substantial evidence if it is consistent with the record as a whole notwithstanding its age.").

After these opinions were issued, Maria H. consulted with orthopedic surgeon Dr. Blum and spine surgeon Dr. Kolb, and considered, but was ultimately told she did not require, surgical intervention. *See, e.g.*, Tr. 2091 (Maria H. "will get [an] mri and consider consult for surg. tenedesis etc."); Tr. 1698 ("We discussed that given her minimal spondylosis would not recommend any surgical interventions at this point."). While the ALJ noted the objective observations of Maria H.'s physician during her November 1, 2021 consultation with Dr. Kolb, Dr. Kolb's treatment notes do not opine on Maria H.'s functional limitations in terms sufficient to clarify how much Maria H. can lift and whether she could lift any specific weight frequently, sporadically, or not at all.[10]  *See id.*; *see generally* Tr. at 1695–98 ("No restriction in

---

[10] The relevant excerpt of Dr. Kolb's treatment notes is reproduced below:

Head/neck
- No restriction in cervical flexion, extension, rotation, or lateral bending
- No pain with cervical flexion, extension, rotation, or lateral bending
- No tenderness to palpation over posterior cervical spine or trapezius muscles
- No previous incisions
- Negative Spurling's maneuvers
- Negative Lhermitte's sign
Spine/ribs/pelvis
- No tenderness to palpation over spine or buttocks
- No previous incisions
- No restriction in thoracolumbar flexion, extension, rotation, or lateral bending
- No pain in back or legs with flexion or extension
-- No elevation of shoulders or pelvis
Extremities
- Normal peripheral pulses with no edema, swelling, varicosities, or lymphadenopathy
- Normal alignment and muscle tone with no masses, asymmetric atrophy/hypertrophy, tenderness to palpation, ligamentous instability, or crepitus/effusions/subluxations of the major joints
- Negative straight leg raising tests

Neurologic-
-**Gait**:

thoracolumbar flexion, extension, rotation, or lateral bending. . . would recommend to continue

with nonsurgical management of her pain including physical therapy, activity modification, and

pain management evaluation for sacroiliac injections trigger point injections facet injections and

if deemed necessary epidural injections."). The ALJ, however, applied Dr. Kolb's findings that

Maria H. displayed "normal ROM and 5/5 strength" to determine Maria H.'s RFC. Tr. at 1256.

     Although Maria H. testified to being unable to lift more than ten pounds at the hearing for

several years, the ALJ determined that her "medical records showing normal ROM and 5/5

strength militate against the allegations she presented at the hearing." *Id.* In so doing, the ALJ

discounted Maria H.'s other medical records that indicate potential functional limitations. For

example, at Maria H.'s physical therapy in 2019, she was reported to have limited range of

motion in her right shoulder, *see, e.g.*, Tr. at 2272 ("Attempted to perform ROM to right shoulder

and gentle AROM scapular ex's, but patient not tolerating the movement of the right arm."), and

appears to have experienced difficulty lifting ten pounds, Tr. at 2267 ("Scoring: 0=Extreme

difficulty completing activity/task 10=Can easily perform activity/task . . . Activity #2 Score: 0

Details: Lift heavy 10 lb."); Tr. at 2280 (same).

---

Non-antalgic **gait**
Does not require **assistive device** for ambulation
No difficulties walking on heels/toes
- Strength
R/L Deltoids - 5/5
R/L Biceps - 5/5
R/L Wrist extensors - 5/5
R/L Triceps - 5/5
R/L Wrist flexors - 5/5
R/L Finger Extensors-5/5
R/L Hand intrinsics - 5/5
R/L Hip flexors - 5/5
R/L Quads - 5/5
R/L TA - 5/5
R/L EHL - 5/5
R/L Gastroc - 5/5

Tr. at 1697 (emphasis in original).

Yet, the ALJ determined that Maria H. would be capable of "light work," which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 CFR 404.1567(b) and 416.967(b). Maria H.'s strength and ability to lift is a material issue, and her medical records do not provide a clear answer as to her functional limitations resulting from her medical diagnosis.

Indeed, the ALJ may have reached a different outcome regarding Maria H.'s RFC had he consulted the expertise of Maria H.'s treating physicians or some other medical expert about the specific functional limitations of her physical conditions, i.e., their impact on her ability to "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds,"  20 CFR 404.1567(b) and 416.967(b), rather than conducting his own analysis of the medical records. *See Nelson v. Comm'r of Soc. Sec.*, 351 F. Supp. 3d 361, 369 (W.D.N.Y. 2018) ("Although the written determination contains a description of Plaintiff's daily activities, the ALJ is not a medical expert, and is not permitted to translate these activities into functional limitations."); *cf. Sanchez v. Colvin*, No. 13-cv-6303 (PAE), 2015 WL 736102, at *8 (S.D.N.Y. Feb. 20, 2015) ("The critical point is that *all* of these records lack the sorts of nuanced descriptions and assessments that would permit an outside reviewer to thoughtfully consider the extent and nature of Sanchez's mental-health conditions and their impact on her RFC.") (emphasis in original).

Relatedly, the need to clarify Maria H.'s ability to sit for a prolonged period of time, based on medical evidence, prompted, in part, the earlier decision to remand this case. *See* Recommended Ruling at 33; Tr. at 1330 ("One note that may suggest a functional limitation is Dr. Aranguren's post-treatment note from a visit in January of 2017, which recommended that plaintiff stand all day and limit prolonged sitting. Although Dr. Aranguren issued this

22

recommendation closer in time to plaintiff's October 2016 work injury, the later medical records do not suggest whether Dr. Aranguren continued to endorse this approach, and the ALJ later determined that plaintiff could perform light work that required her to sit, stand, or walk for a total of eight hours. An opinion from Dr. Aranguren, or another treating source, could have clarified whether plaintiff would face any standing or sitting limitations in the workplace.").

As a result, "[o]n remand, the ALJ should request updated treatment notes from plaintiff's treating sources and seek a medical opinion, ideally from a treating source, regarding plaintiff's functional limitations." Recommended Ruling at 36; Tr. at 1333. Here, unlike in *Tankisi*, the ALJ did not have any "assessment of [Maria H.'s] limitations from a treating physician," and the medical records did not clearly support the ALJ's finding regarding Maria H.'s RFC. *Tankisi*, 521 F. App'x. at 34.

Accordingly, remand once again to further develop the record is warranted in order for the ALJ to seek a medical source statement from Maria H.'s treating physician or some other medical expert regarding the specific functional limitations, if any, caused by her physical conditions, as it relates to her ability to perform work-related tasks, including her capacity to lifting and carrying objects of a certain amount and ability to sit for prolonged periods of time between the periods of October 20, 2016 and December 22, 2021. *See Hallett v. Astrue*, 2012 WL 4371241, at *7 (D. Conn. 2012) ("Where the ALJ fails to fulfill the duty to develop the record, the reviewing district court should reverse the Commissioner's decision and remand the appeal from the Commissioner's denial of benefits for further development of the evidence.").

### B.  Remaining Arguments

Maria H. has identified three other arguments for reversal, however, because the Court has determined that remand for further administrative proceedings is necessary, the Court declines to reach these issues.  *Alvarez v. Comm'r of Soc. Sec.*, No. 14-CV-3542 MKB, 2015 WL 5657389, at *18 (E.D.N.Y. Sept. 23, 2015) ("Where, as here, an ALJ fails to adequately develop the record in reaching a conclusion on a claimant's residual functional capacity, the Court is unable to review whether the ALJ's denial of benefits was based on substantial evidence.")

While the Court is not obligated to address Maria H.'s other arguments, it will briefly address Maria H.'s contention that the ALJ's Step Five findings were deficient because he did not consider her difficulties as to reading and speaking in English. Mem at 31–32.

Maria H. argues that it was plain error for the ALJ to refuse to make a finding regarding Maria H.'s ability to speak English, and "the ALJ's argument that Social Security Ruling 20-1p allows him to ignore English language fluency *in all contexts* is equally plain error." Mem. at 32 (emphasis in original).

The Commissioner contends that "The ALJ's reasoning was correct. The ALJ rendered his decision on December 20, 2022, but as of April 27, 2020, SSA eliminated the inability to speak English from its consideration at step five." Opp. at 23 (citing SSR 20-01P, 2020 WL 1285114, at *3).

The Court agrees.

Courts in this Circuit have recognized that "the inability to speak English is no longer relevant at step five." *Waledahmad A. v. Comm'r of Soc. Sec.*, No. 1:22-CV-398-DB, 2024 WL 3722697, at *12 (W.D.N.Y. Aug. 8, 2024). District courts have recognized that this interpretation aligns with the agency's reasoning in amending the regulation:

24

As one court noted, "[w]hen finalizing the regulation amendment, the [SSA] explained that changes in the national economy indicate that employment rates for people with limited English proficiency have increased since 1980, which suggests that English proficiency is no longer a useful category describing a claimant's 'educational attainment or of the vocational impact of an individual's education for the purposes of our programs,' as it was in 1978, when the former regulation was written."

*Id.* (quoting *Salimeh N. v. Comm'r of Soc. Sec.*, No. C21-1523 (SKV), 2022 WL 1963719, at *4 (W.D. Wash. June 6, 2022) (citing *Removing Inability to Communicate in English as an Education Category*, 85 Fed. Reg. 10,586-01, 10,587, *available at* 2020 WL 885690 (Feb. 25, 2020))) (alteration in original); *see also Pichardo v. Comm'r of Soc. Sec.*, No. 21-cv -06873 (SDA), 2023 WL 2596970, at *20 (S.D.N.Y. Mar. 22, 2023) ("[T]he ALJ was not required to assess Plaintiff's ability to speak, read or understand English, which is no longer relevant to the assessment of education as a vocational factor."); *Vang v. Comm'r of Soc. Sec.*, No. 21-cv-00488 (SAB), 2022 WL 17812859, at *6 (E.D. Cal. Dec. 19, 2022) ("Plaintiff has cited no authority requiring an ALJ to address English proficiency limitations in an RFC assessment or a VE hypothetical under the current regulatory scheme" and "recent agency guidance suggests that such a consideration would be inappropriate").

Accordingly, the ALJ did not err in finding that "when determining the appropriate education category, SSA will not consider whether an individual attained his or her education in another country or whether the individual lacks the English language." Tr. at 1264.

## IV.    CONCLUSION

For the reasons explained above, Maria H.'s motion is **GRANTED** and the Commissioner's motion is **DENIED**.

The decision of the Commissioner is **VACATED** and **REMANDED** for rehearing and further proceedings in accordance with this Ruling and Order.

The Clerk of Court is respectfully directed to close the case.

**SO ORDERED** at New Haven, Connecticut, this 30th day of September, 2024.

_/s/ Victor A. Bolden_

Victor A. Bolden
United States District Judge
